917 F.2d 1302
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Roy Lee HAGOOD, Defendant-Appellant.
 No. 90-5785
 United States Court of Appeals, Fourth Circuit.
 Submitted Sept. 28, 1990.
Decided Nov. 9, 1990.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Chief District Judge. (CR-89-408-A)
 Thomas J. Curcio, Cohen, Dunn & Sinclair, P.C., Alexandria, Va., for appellant.
 Henry E. Hudson, United States Attorney, Richard William Westling, Special Assistant United States Attorney, Alexandria, Va., for appellee.
 E.D.Va.
 AFFIRMED.
 Before PHILLIPS, MURNAGHAN and SPROUSE, Circuit Judges.
 PER CURIAM:
 
 
 1
 On November 17, 1987, Roy Lee Hagood was arrested at Washington National Airport carrying approximately 133 grams of "crack" cocaine. He was subsequently indicted on a charge of possession with intent to distribute more than 50 grams of cocaine base, or crack, in violation of 21 U.S.C. Secs. 841(a)(1) and 841(b)(1)(A)(ii).
 
 
 2
 After unsuccessfully moving to suppress the evidence seized, Hagood pled guilty as charged but expressly reserved the right to appeal the denial of his suppression motion pursuant to Fed.R.Crim.P. 11(a)(2). He was sentenced to a mandatory minimum of ten years imprisonment, a supervised release term of five years, and a special assessment of $50.00.
 
 
 3
 * At about 1:10 p.m. on November 17, 1987, Agent Henry Allen of the Drug Enforcement Administration's Mass Transportation Interdiction Task Force saw Hagood exit a Trump shuttle flight from New York City. Hagood was dressed casually and carried no luggage. He walked past Allen and three other agents assigned to the task force and headed for the escalators. When he was halfway up the escalator, he looked back at the agents and quickly turned his head back straight. At this point, Allen and the other agents decided to follow him. They briefly lost sight of him but found him standing in the taxi line outside of the terminal. Allen approached him, displayed his credentials, and said, "Excuse me, sir. I am a police officer. May I talk with you for a moment." He and Hagood then stepped around a railing, and Allen again identified himself. At this time, one of the agents was standing a few feet away from Allen and Hagood, and two other agents were standing about twenty feet away to Allen's right and left.
 
 
 4
 Allen asked Hagood whether he had just gotten off the Trump shuttle and whether he had a copy of his ticket. Hagood said he must have left his ticket on the plane. Allen then asked him for identification. Hagood produced an identification card with his picture and the name "Odessie Frazer," which Hagood said was not his real name. He said he had flown up that morning to visit a cousin and was just returning. Allen explained the purpose of the task force and asked Hagood whether he was carrying any narcotics. Hagood said, "No."
 
 
 5
 Allen then asked Hagood if he would mind if he patted down his person. Hagood said, "No, I don't mind." As Allen started to pat down his coat, Hagood seemed to get a little nervous and asked if they could go somewhere more private. They walked back into the terminal and headed towards a corner of a large room near the Pan Am luggage area. Allen asked Hagood if this area was all right and he seemed to nod. Allen asked again if Hagood minded if he searched him, and Hagood again said, "No." As Allen was patting Hagood's upper right leg, his thumb touched a lumpy package in the lower groin area. He asked Hagood twice what it was. Both times, Hagood looked away and did not answer. He was then placed under arrest.
 
 
 6
 Hagood testified that while he was standing in line for a taxi, Allen reached in front of him and showed him his badge. He pointed out of the line and said, "I need to ask you a few questions. I will hold your place in line for you." After Allen asked a few questions, he said, "Can I search your coat." Hagood said, "Sure, you can search my coat." After they went inside the terminal, Hagood testified that Allen asked if he could search his pockets. Allen searched his pockets and then patted down his leg. Hagood felt a touching in the groin area. He testified that he did not know he could have refused to answer the questions or consent to the search.
 
 
 7
 The district court found that the questioning was a voluntary encounter between a police officer and a citizen with no fourth amendment implications. It found that the consent to search was voluntarily given and the search did not exceed the scope of the consent given.
 
 II
 
 8
 The "clearly erroneous" standard applies in reviewing a district court's finding that a seizure did not occur. United States v. Wilson, 895 F.2d 168, 171 (4th Cir.1990). In determining whether a seizure has occurred, the focus is on whether, in view of all the surrounding circumstances, a reasonable person would have believed he was not free to leave. Michigan v. Chesternut, 486 U.S. 567, 573 (1988) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). The agents' conduct must be measured according to the probable perspective of a reasonable person, not the subjective perception of the particular defendant. Wilson, 895 F.2d at 171. The inquiry generally focuses on three areas: (1) the conduct of the police, (2) the unique characteristics of a particular defendant, and (3) the physical surroundings of the encounter. United States v. Gray, 883 F.2d 320, 322 (4th Cir.1989).
 
 
 9
 In examining the conduct of the police, courts have looked to whether "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen such that he is not free to walk away." Id. at 322 (quoting United States v. Viegas, 639 F.2d 42, 45 (1st Cir.), cert. denied, 451 U.S. 970 (1981)). Factors which indicate a "show of authority" are (1) the number of officers present, (2) whether the officers were in uniform and whether they displayed their weapons, (3) whether the officer touched the defendant or made any attempt to physically block his departure or restrain his movement, (4) whether the officer's questioning was conversational rather than intimidating, (5) whether the officer told the defendant he suspected him of criminal activity rather than treating the encounter as routine, and (6) whether the officer promptly returned requested tickets or identification. Id. at 322-23.
 
 
 10
 Only two officers were at the taxicab area where Allen questioned Hagood; two others were twenty to thirty feet away. The officers were not in uniform and did not touch Hagood. The questioning was conversational and routine in nature. Hagood's identification card was returned promptly. The exact wording of the request to step out of line differed according to Allen and Hagood, and although Hagood's recounting is arguably more authoritative than Allen's, the district court is in a better position to resolve questions of credibility. It cannot be said here that the court was clearly erroneous in finding Allen more credible. See Wilson, 895 F.2d at 172 (citing United States v. Sutton, 850 F.2d 1083, 1086 (5th Cir.1988)).
 
 
 11
 Hagood contends that his age of 19 and his lack of sophistication in criminal law made him feel he could not walk away. However, these characteristics are not particularly unique and certainly do not show that Hagood was so "naive or vulnerable to coercion that special protections from police contacts were required by the Fourth Amendment." Gray, 883 F.2d at 323 (quoting United States v. Black, 675 F.2d 129, 135 (7th Cir.1982), cert. denied, 460 U.S. 1068 (1983)).
 
 
 12
 Finally, because of the public nature of the questioning and the search, Hagood was not isolated or restrained in any way so as to reduce the voluntary nature of the exchange. See Gray, 883 F.2d at 323. Moving inside the terminal was only an attempt to accommodate Hagood's request for more privacy. Moreover, they only moved to the outer area of a heavily trafficked part of the terminal. The search still took place in a public, albeit less visible, area.
 
 III
 
 13
 Whether consent to a search is voluntary "is to be determined by the totality of all the circumstances, and is a matter which the Government has the burden of proving." Mendenhall, 446 U.S. at 557. The inquiry is subjective, and the district court's findings are to be reviewed under the clearly erroneous standard. Wilson, 895 F.2d at 171, 172. Hagood again relies on his age, his lack of sophistication, and his testimony at the hearing that he did not know he could refuse to show that his consent was not voluntary. However, Allen's requests to search clearly asked permission--both times, he asked if Hagood minded if he searched his person, and both times Hagood unequivocally said "sure" or "no," he didn't mind. Allen was in plain clothes, made no threats, displayed no weapons, and asked to search Hagood in public. Proof of knowledge of a right to refuse consent to a search is not essential to show effective consent. Id. at 172. The record contains sufficient evidence to support the district court's finding that Hagood consented to a pat-down search.
 
 
 14
 Hagood also claims that the search exceeded the scope of consent. He claims that Allen only asked if he could search his coat or his pockets. Allen testified that he asked if he could search or pat-down his person. Hagood's version is inconsistent with standard procedures used by the DEA in airport encounters. Again, the district court is in the best position to make credibility determinations, and it cannot be said that the court's findings were clearly erroneous.
 
 
 15
 Hagood specifically claims that his consent did not extend to a search of his groin area. He cites United States v. Blake, 888 F.2d 795 (11th Cir.1989), in which the agent "immediately reached into defendant's crotch area and felt [his] genitals." Id. at 796. The search in Blake was clearly more intrusive than the search of Hagood, during which Allen felt a hard substance in the lower groin area as he was patting down Hagood's upper right leg. Compare Wilson, 895 F.2d at 170 (consent found when agent asked if he could search defendant's person, defendant assented by shrugging, and agent felt a very hard substance in defendant's groin area). The search conducted on Hagood was encompassed by the request to "search his person."
 
 
 16
 Because we find that the record supports each of the district court's findings, we affirm. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.
 
 AFFIRMED